# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WILLIAM P. LEGER,   )<br>   )<br>   Plaintiff,   )<br>   )<br>v.   )<br>   )<br>KAREN JAIMET   )<br>and DR. VIPIN SHAH,   )<br>   )<br>   Defendants.   )  | Case No. 3:15-cv-00080-SMY-RJD |

## MEMORANDUM AND ORDER

Plaintiff William Leger, currently 70 years old, is an inmate with the Illinois Department of Corrections ("IDOC"). In late November 2010, he injured his right shoulder while passing out laundry at Menard Correctional Center ("Menard"). Leger was transferred to Pinckneyville Correctional Center ("Pinckneyville") the following year. He injured his shoulder again in February 2012 when he suffered a fall while climbing down from his bunkbed. An orthopedic surgeon later diagnosed Leger as having a complete rupture of the rotator cuff. Despite the injury, prison medical staff declined to provide Leger with surgery. Leger brings this action against Dr. Vipin Shah, asserting that Dr. Shah was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.

Dr. Shah is a prison physician and an employee of Wexford Health Sources, Inc. ("Wexford"). Wexford is a contractor that provides healthcare services to IDOC inmates. Leger also seeks prospective injunctive relief. Therefore, the Pinckneyville Warden, currently Karen Jaimet, has been added as a defendant in her official capacity only.

Defendants now seek summary judgment. (Docs. 69, 70, 71 and 72). Plaintiff opposes both motions. (Docs. 73, 74, 75, and 76). Defendants also filed reply briefs (Docs. 77 and 78) to Plaintiff's responses. For the following reasons, Defendants' motions are **DENIED**.

**Factual Background**

The following facts were obtained from Leger's deposition unless otherwise noted. (Leger Deposition, Doc. 70-1). Leger entered IDOC custody in 1988. *Id*. at 3. He is currently 70 years old. *Id*. at p. 2. In November 2010, Leger was working as a cell house custodian at Menard when he injured his right shoulder while passing out small bags of laundry to the inmates in the cell house. *Id*. at p. 6. "It felt like something ripped" in his shoulder when he threw a three to five pound bag to an upper gallery. *Id*. at p. 6. Menard medical staff examined Leger after the injury. *Id*. at p. 7. Leger's treating physicians provided medication, but he was not provided physical therapy or sent to an outside specialist. *Id*. at p. 7.

On December 25, 2011, IDOC officials transferred Leger from Menard to Pinckneyville. ("Offender Health Status Transfer Summary" Form, Doc. 70-2, p. 3). On the medical transfer form, the nurse noted that Leger underwent a bowel resection in 2009, a colonoscopy and EGD in 2011 and had a history of back surgeries. *Id*. The nurse also noted that he had hypertension and dyslipidemia. *Id*. His medications included Metamucil, Vasotec (hypertension medication), Inderal (heart/hypertension medication), Digoxin (heart medication), Maxzide (hypertension medication), ECASA (coated aspirin) and niacin (used to manage cholesterol). *Id*.

On February 12, 2012, Leger was admitted to the Pinckneyville infirmary after he fell from his bunkbed. (Doc. 70-2, p. 6). He was getting down from the top bunk when his shoulder "gave way," causing him to fall off the bed, hitting the toilet and floor. (Doc. 70-1, p. 8). Upon arriving at the Health Care Unit, Leger told the treating nurse that he was experiencing pain in

his chest and having difficulty breathing. *Id*. at p. 10. In Leger's medical records, there is a nurse's entry from February 12, 2012 at 9:00 p.m. stating, "[inmate] brought over by leutinent [sic] [complaining of] injury to [left] posterior rib area – radiating to [left] front rib area [complains] also of low back pain." (Doc. 70-2, p. 6). Leger told the nurse, "I fell off my bunk." *Id*. The nurse contacted Dr. Shah and Dr. Shah examined Leger the following morning. *Id*. at p. 7.

Dr. Shah's handwritten medical entries are almost entirely illegible, but according to his affidavit attached to his motion for summary judgment, he observed that Leger had a soft tissue injury to his left ribs. (Doc. 70-5, p. 2). Dr. Shah "ordered X-rays of [Leger's] left ribs, gave [Leger] low bunk privileges indefinitely, and told the nurse that he could be released to his housing unit but would need to be rechecked the following Friday." *Id*.

On February 16, 2012, Dr. Shah reviewed Leger's x-rays and noted he had two rib fractures. (Doc. 70-5, p. 2). Dr. Shah prescribed Tylenol and ordered a follow up appointment in four weeks. *Id*. It is unclear from the medical records whether he personally examined Leger on that date. *Id.* at p. 10.

On May 21, 2012, Leger was examined by a nurse for complaints of pain in his shoulder. (Doc. 70-2, p. 11). The nurse noted that Leger's "shoulder still hurts from fall." *Id*. The nurse observed no swelling or bruising, but Leger experienced discomfort when he lifted his arm above his shoulder. *Id*. The nurse issued Leger a prescription for Tylenol for one week and directed him to "[r]eturn to see provider if symptoms worsen or interfere with daily functioning." *Id*.

Leger continued to experience pain in his shoulder. He was next seen by a nurse on July 13, 2012. (Doc. 70-2, p. 12). The nurse referred Leger to see a physician and on July 17, 2012, he was examined by Dr. Shah. *Id*. at p. 13. Dr. Shah states in his affidavit that this was the first

time he examined Leger's right shoulder. (Doc. 70-5, p. 3). Leger told Dr. Shah that his injury occurred in 2010 at Menard and that he was now "losing strength and feeling in his hand." *Id*. Dr. Shah ordered that Leger's previous x-rays be sent to Pinckneyville and for Leger to receive an MRI examination of his right shoulder. *Id*.

On July 19, 2012, Dr. Shah submitted a "Medical Special Services Referral and Report" to the Wexford Utilization Management Office (as part of a process referred to as "collegial review"), recommending that Leger receive an MRI examination. (Doc. 70-2, p. 97). He also discussed physical therapy with Leger and scheduled him to see a physical therapist. *Id.* at p. 17. Despite an initial scheduling of July 26, 2012, Leger was not seen by the physical therapist until November 19, 2012. *Id.* at p. 100. The physical therapist assessed Leger as having "[right] shoulder pain, significant rotator cuff and biceps strength impairment [and] loss of functional AROM [.]" *Id*. The therapist recommended physical therapy twice a week for eight weeks and to "continue to follow up [with] M.D. / N.P. for pain." *Id*. Leger participated in physical therapy sessions from late November 2012 through mid-January 2013. (Doc. 70-5, p. 4).

On July 26, 2012, Dr. Baker at the Wexford Utilization Management Office denied approval of the MRI examination. (Doc. 70-2 at p. 98). Dr. Baker noted:

> Comments: Inmate with complaints of upper arm discomfort due to old injury. No limb atrophy or neurovascular comprimised [sic] noted on exam. Inmate's xrays were negative when he was at Menard cc. Dr. Baker advises starting PT for strengthening and ROM exercises. Dr. Shah in agreement with alternate plan. Represent if needed. *Id*.

On December 17, 2012, Dr. Shah again submitted a request for an MRI to collegial review. (Doc. 70-2, p. 101). Wexford denied the request and directed that Leger receive the full course of physical therapy. *Id*. at p. 102. On January 17, 2013, the physical therapist drafted a re-evaluation report, assessing "[p]ersistent pain, persistent [right] shoulder weakness, probable rotator cuff dysfunction. No significant improvement in functional [range of motion]." *Id*. at p.

4

104. Dr. Shah then submitted another request for an MRI to collegial review which was approved on January 22, 2013. *Id.* at p. 106.

Leger underwent an MRI on January 30, 2013 at Carbondale Memorial Hospital. (Doc. 70-2, p. 124). The reviewing physician's report states in part, "[f]ull thickness, full width tears of the supraspinatus and infraspinatus with tendon retraction and marked muscle atrophy." *Id.* at p. 125. Dr. Shah examined Leger on March 12, 2013 and recommended that he receive an outside consultation with an orthopedic surgeon. *Id.* at p. 41. The request was approved two days later. *Id.*

On April 18, 2013, Leger was examined by Dr. Richard Morgan at the Orthopedic Institute of Southern Illinois. (Doc. 70-2, pp. 110-111). Dr. Morgan's report to Dr. Shah states:

> Mr. Legar [sic] is a 66-year-old inmate who was injured about two years ago when he was throwing laundry at Menard Correctional Facility. He threw a large laundry bag from the sixth floor to the eighth floor and started having pain immediately. He said it felt like something came out of place in his shoulder. He's been having a little pain ever since. It's never really stopped. It was aggravated once when he was coming down off of a top bunk when he was at Pinckneyville and he had some increasing amounts of pain in it.
>
> [Medical history reviewed along with general observations of patient]
>
> Now he is unable to abduct his arm. He has fairly normal passive range of motion but definitely pain and impingement with active abduction.
>
> Medical Data Review: His x-rays are normal.
>
> His MRI has shown a complete rupture of his rotator cuff with upward migration of the head and definite impingement.
>
> He clearly has some legitimate shoulder pain. I don't think that a rotator cuff repair will help him. If he does anything, he'll have to have a reverse total shoulder. He tells me he has a natural life sentence. Certainly if he does have a reverse total shoulder physical therapy will be very much necessary for his appropriate recovery. *Id.*

Dr. Shah examined Leger upon his return. (Doc. 70-2, p. 43). He prescribed Elavil (antidepressant / pain medication) and 500 mg of Tylenol twice per day as needed and ordered

5

Leger to return for a follow up examination in two weeks. *Id.* During his deposition, Dr. Shah testified that he did not speak to Dr. Morgan regarding Leger's treatment plans, but that he interpreted Dr. Morgan's report as not recommending any surgery at that time. (Doc. 70-3, p. 10).

On April 25, 2013, Leger was examined by a nurse due to complaints that the Elavil was causing an adverse reaction. (Doc. 70-2, p. 44). Dr. Shah discontinued the Elavil and prescribed Ultram, another pain medication. *Id*. at 45.

Leger continued to experience pain in his shoulder and returned for a follow up appointment with Dr. Shah on May 13, 2013. (Doc. 70-2, p. 46). Dr. Shah continued the Ultram and ordered additional physical therapy. *Id*. Leger underwent physical therapy from late May through July 2013. (Doc. 70-5, p. 5). During the physical therapy sessions, Leger frequently complained of pain and weakness in his shoulder and arm. (Doc. 70-2, pp. 48-70).

Dr. Shah examined Leger on July 23, 2013, August 15, 2013 and October 21, 2013. (Doc. 70-5, p. 6). Leger told Dr. Shah that the pain medication and physical therapy were beneficial, but he asked for shoulder surgery. *Id*. Dr. Shah continued the conservative course of treatment, but did increase Leger's Ultram prescription and renewed it when he examined him again on January 21, 2014. *Id*.

On January 28, 2014, Nurse Practitioner Rector received a grievance from Leger complaining that the 100 mg of Ultram was "not much help." (Doc. 70-2, p. 75). Rector issued a request to collegial review that Leger receive a follow up orthopedic examination. *Id*. at p. 114. The request was denied on February 10, 2014. *Id*. at p. 115.

Dr. Shah examined Leger on February 20, 2014 and prescribed Tylenol 500 mg at bedtime. (Doc. 70-5, p. 7). On March 31, 2014, Dr. Shah noted in Leger's medical records that

collegial review had denied the shoulder repair surgery based on Leger's age, comorbidities, overall physical condition and the likelihood of normalization of the tendon. (Doc. 70-2, p. 79). Dr. Shah ordered more physical therapy at that time. *Id*. In July 2014, Dr. Shah prescribed Leger Mobic, an anti-inflammatory medication used to treat pain. *Id.* at p. 84.

On September 16, 2014, Dr. Shah examined Leger for complaints of pain in both his left and right shoulders. (Doc. 70-5, p. 8). He ordered additional tests, including a cervical spine x-ray. *Id*. During the examination, Leger told Dr. Shah that the Ultram and Mobic were not helping and Dr. Shah discontinued the medications. *Id*. However, Leger continued to receive Tylenol. *Id*. The x-rays showed "no acute vertebral compression fractures or facet subluxation, but [Leger] did have cervical disc space narrowing with bone spurs at C6-C7, and degenerative disc disease at C4-C5." *Id*. Dr. Shah submitted another request to collegial review for an orthopedic consultation, but the request was denied. *Id*.

On October 7, 2014, Dr. Shah followed up with Leger on the denial of the orthopedic consultation, and prescribed Tylenol #3 (Tylenol with codeine) twice per day. (Doc. 70-5, p. 8). Dr. Shah examined Leger again on December 22, 2014 and prescribed Naprosyn, an anti-inflammatory medication. (Doc. 70-2, p. 90).

Leger initiated this lawsuit on January 26, 2015. (Doc. 1). His medical records indicate that he continues to experience pain and limited mobility in his right shoulder. He has not undergone shoulder surgery. (Doc. 70-5, pp. 10-13).

Dr. Morgan, the orthopedic surgeon that examined Leger on April 18, 2013, has been deposed. (Doc. 70-4). When asked if there was "anything significant in [Leger's] medical history regarding this incident that would prevent a surgery for a rotator cuff repair or a total shoulder reverse surgery," Dr. Morgan responded, "Not really." *Id*. at p. 3. He further testified:

[Plaintiff's Counsel] Q. Okay. All right. Now, after you reached your diagnosis of Mr. Leger, did you come to any recommendations regarding treatment for his right shoulder?

[Dr. Morgan] A. Yes. I told Mr. Leger, you know, what his problem was. I told him that given the chronicity of his rotator cuff tear, the atrophy of his rotator cuff and the upward migration, I told him I didn't think a rotator cuff repair would be possible or certainly helpful for it.

Q. Let me stop you right there. You said it wouldn't be helpful, because he needed something more invasive than that?

A. Correct. So at this point in time, I think his rotator cuff tear is irreparable at this point. And the only thing that will eliminate his pain would be a reverse total shoulder. A standard total shoulder requires a functional rotator cuff. He doesn't have that, so the only thing what would really be beneficial to ameliorate his pain would be a joint replacement and a reverse shoulder replacement.

Q. And are you recommending that he has a reverse total shoulder replacement surgery to ameliorate his pain?

A. Yes. I mean, that decision – and the answer is yes, but that decision is based on the amount of pain that somebody's having. And if somebody came in with a shoulder exactly like Mr. Leger's and says, Eh, it doesn't hurt me bad, I'd say, Well, you know there's nothing that you could really do short of surgery. If the pain is bad enough, then the surgery will, you know, will definitely help. That's really the only thing that will help. He said it was bad enough and he wanted it fixed. That's the only thing that will fix it, and that's what I would recommend to him. *Id*. at p. 5.

Later in the deposition, counsel for Dr. Shah asked Dr. Morgan, "Do you think that the decision for him not to have the surgery was blatantly inappropriate?" *Id*. at p. 11. Dr. Morgan responded, "Yeah, probably." *Id*. at p. 11. Plaintiff's counsel also asked Dr. Morgan, "Did you see anything in Mr. Leger's history that would preclude him from having this type of surgery that he needs such as the medical comorbidities that you talked about?" *Id*. at p. 13. Dr. Morgan responded "No, no. Certainly he had them, and we would do clearances, but there was nothing objective that I saw about him or his demeanor that would preclude surgery." *Id*. at p. 13.

**Discussion**

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." The facts and all reasonable inferences are to be drawn in a light most favorable to the nonmoving party. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012). In ruling on a motion for summary judgment, the court shall not "weigh evidence, make credibility determinations, resolve factual disputes and swearing contests, or decide which inferences to draw from the facts." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). Summary judgment shall be denied if a reasonable jury could find in favor of the nonmoving party. *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017).

Inmates have an Eighth Amendment right to adequate food, clothing, sanitation and medical treatment. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994). Although inmates are entitled to adequate medical care, not all untreated medical conditions will give rise to an Eighth Amendment claim. Rather, in order to establish an Eighth Amendment denial of medical treatment claim, the plaintiff must demonstrate [1] that he suffered from an "objectively serious medical condition" and [2] that the defendants were "deliberately indifferent" to the condition. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Leger's shoulder injury was unquestionably an objectively serious medical condition. Therefore, the issues are whether Dr. Shaw was deliberately indifferent to Leger's condition and whether Leger suffers from an ongoing Eighth Amendment violation entitling him to injunctive relief.

Deliberate indifference requires a "sufficiently culpable state of mind" on the part of defendant. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). Deliberate indifference exists

if a prison official knows of and disregards a "substantial risk of serious harm." *Petties,* 836 F.3d at 728. This is a less demanding standard than purposeful, but it requires something more than ordinary negligence. *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).

An inmate does not have to be completely ignored to have a valid Eighth Amendment claim. *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011). An inmate who receives some treatment can still establish deliberate indifference, so long as the treatment received is "blatantly inappropriate." *Id*. (*quoting Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir.2005)). Moreover, "[a] delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010).

## *Dr. Shah*

The record reflects that Dr. Shah provided a great deal of medical care to Leger. After Leger fell off of his bunk in February 2012, Dr. Shah ordered tests and physical therapy. When the physical therapy sessions did not provide significant improvement, Dr. Shah ordered, with approval, an MRI examination and a consultation with an orthopedic surgeon, Dr. Morgan. On April 18, 2013, Dr. Morgan sent a report to Dr. Shah discussing Leger's condition. The report stated in part, "He clearly has some legitimate shoulder pain. I don't think that a rotator cuff repair will help him. If he does anything, he'll have to have a reverse total shoulder." Apparently, Dr. Shah did not discuss Dr. Morgan's findings with him. However, Dr. Shah's interpretation of Dr. Morgan's report was that the surgeon was not necessarily recommending a reverse total shoulder reconstruction, but rather was identifying it as a last resort if the pain was not controlled. Since the examination with Dr. Morgan, Leger has been provided treatment by Dr. Shah in the form of physical therapy, pain medication, anti-inflammatory medication and

10

various tests. Dr. Shah submitted additional requests to collegial review for a follow up orthopedic surgeon consultation, but the requests were denied.

Even assuming that Dr. Morgan's April 18, 2013 report to Dr. Shah is ambiguous as to the recommended course of treatment, a jury could reasonably conclude that the decision to maintain a conservative course of treatment for an extended period (i.e., pain medication and physical therapy) constitutes deliberate indifference. A prison official's decision to "persis[t] in a course of treatment known to be ineffective" may support a finding of deliberate indifference, even though the prisoner received some medical treatment. *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016). The situation may have been different if the prescribed pain medication had provided satisfactory results, but Leger consistently complained that he was not getting any relief.

Additionally, Dr. Shah asserts that due to Leger's age and preexisting health conditions, he was not a good candidate for shoulder surgery, and therefore, the denial of the "reverse shoulder" did not constitute deliberate indifference. Dr. Shah also emphasizes the fact that Dr. Morgan did not review Leger's full medical records when making his diagnosis that a reverse shoulder surgery was the proper course of treatment. Although Dr. Morgan did not have access to all of Leger's medical records, he did discuss Leger's medical history with him (Dr. Morgan mentions that he discussed Leger's medical history with him in the report sent to Dr. Shah). While Dr. Shah concluded that Leger may not be a good candidate for the reverse shoulder surgery due to his existing health problems, his opinion, to the extent that it conflicts with Dr. Morgan's opinions, creates a material issue of disputed fact for the jury's determination.

Dr. Shah also points out that he did recommend that Leger receive a follow up examination by an outside orthopedic surgeon, but his requests were denied during the Wexford

collegial review process. According to Dr. Shah, if a prison physician would like to have a patient seen by an outside medical provider for non-emergency treatment, the prison physician must receive approval in collegial review. The Court agrees that if Dr. Shah did all that was within his power to ensure that Leger received adequate health care, then he cannot be found to be deliberately indifferent.

The record is unclear as to the specific requirements and procedures associated with the Wexford collegial review process. However, the Wexford collegial review forms appear to give the onsite medical providers an "appeal" option if the onsite physician is dissatisfied with the collegial review decision and an "I want a second opinion" option if the appeal is dissatisfactory. *See, e.g.* Doc. 70-2, p. 119. Although Dr. Shah did appeal some of the collegial review decisions that denied Leger an outside referral, there is no evidence that he ever utilized the "second opinion" option. A jury could therefore conclude that Dr. Shah's efforts, under the circumstances, constitute deliberate indifference. As such, summary judgment is inappropriate for Plaintiff's claims against Dr. Shah.

### *Karen Jaimet*

In addition to the individual capacity claim against Dr. Shah, Leger asserts that he continues to be subjected to an ongoing Eighth Amendment violation and he seeks prospective injunctive relief. Karen Jaimet, the Warden of Pinckneyville, has therefore been added in her official capacity for the purpose of ensuring that any injunctive relief imposed is provided.

Jaimet presents two main arguments in her motion for summary judgment. First, she argues that Leger is not suffering from an ongoing Eighth Amendment violation. However, as previously noted in the Court's analysis regarding Dr. Shah, a reasonable factfinder could conclude that Leger is suffering from an ongoing, improperly treated and objectively serious

12

medical condition, thereby violating his Eighth Amendment rights. Thus, Jaimet's first argument fails.

She next contends that she is immune from suit because she "has not, and is not, engaging in any specific conduct that impinges upon the medical treatment, or alleged lack thereof, received by the Plaintiff during the course of his incarceration." Jaimet also asserts that she cannot order Wexford or their doctors to perform any particular treatment for an inmate.

Significantly, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989) (internal citation omitted). As such, whether IDOC officials can order Wexford physicians to provide specific medical services is immaterial. Under the Eighth Amendment, the State of Illinois has a non-delegable duty to provide its inmates with adequate medical care. If Wexford fails to provide adequate medical services, IDOC must still fulfill that obligation. Should this Court issue an injunction ordering IDOC to provide medical care to an inmate, IDOC must comply- even if that means that it must resort to using another healthcare provider outside of Wexford. IDOC simply cannot avoid its duty to provide healthcare to inmates by arguing that it does not have the authority to order Wexford to provide specific services. For these reasons, Jaimet's motion for summary judgment is denied.

**IT IS SO ORDERED.**

**DATED: November 2, 2017**

**s/ Staci M. Yandle**
**STACI M. YANDLE**
**United States District Judge**